

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00071-CR
_____

CHARLES LANCE TAYLOR, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 18,958

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

# MEMORANDUM OPINION

An Upshur County jury found that Charles Lance Taylor threatened to shoot Barbara Fry due to her status as a State's witness and, as a result, convicted Taylor of the offense of retaliation, a third-degree felony. *See* TEX. PENAL CODE ANN. § 36.06(a)(1)(A), (c). After Taylor pled true to the State's punishment enhancement allegations, the jury assessed a sentence of ninety-nine years' imprisonment. On appeal, Taylor argues that the jury's verdict of guilt was not supported by sufficient evidence. He also argues that the trial court erred by admitting extraneous-offense evidence and by allowing an alternate juror to remain in the jury room.

We find that (1) legally sufficient evidence supports the jury's verdict of guilt, (2) Taylor failed to preserve any complaint about the admission of extraneous-offense evidence, and (3) Taylor was unharmed by the presence of the alternate juror in the jury room during deliberations.

Even so, we modify the trial court's judgment to reflect the proper degree of offense. As modified, we affirm the trial court's judgment.

## I. Legally Sufficient Evidence Supported the Jury's Verdict of Guilt

In his first point of error, Taylor argues that the jury's verdict of guilt was not supported by legally sufficient evidence. We disagree.

### A. Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297

2

(Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Paroline v. State*, 532 S.W.3d 491, 498 (Tex. App.—Texarkana 2017, no pet.) (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240). Here, the State alleged that Taylor intentionally or knowingly threatened to harm Fry "by an unlawful act, namely shooting her, in retaliation for or on account of [her] status . . . as a witness."

### B. The Evidence at Trial

At trial, the evidence showed that Fry became a witness when Taylor committed family violence assault by occlusion against her. Fry testified that she and Taylor, her boyfriend, moved in together in July 2019. She described the relationship as "[p]retty good" at first but testified that it soured after Taylor began assaulting her on "[t]oo many" occasions. Fry said she would split up with Taylor for a while instead of reporting his abuse but would return to him because she loved him. On June 23, 2020, Fry left Taylor for the last time.

The evidence showed that the couple had argued on that day because Fry had sold Taylor's belongings to raise enough money to bail him out of jail. Fry was not living with Taylor at the time, and she went home after the argument. Fry said she was sleeping at her own home when Taylor burst through her bedroom door, grabbed her, tried to drag her off the bed, and struck her. Fry testified that Taylor choked her and that she could not breathe. According to

4

Fry, Taylor kept hitting her in the head and put her in a headlock, but she was able to run and escape after "grabb[ing] . . . his private area." While fleeing from Taylor, Fry went to her neighbor's house. Seeing that Fry had escaped, Taylor fled the scene.

Anthony Moore, an officer with the City of Lone Star Police Department, testified that he was dispatched to Fry's neighbor's house, where he met with Fry. According to Moore, Fry had "apparent bruising around her neck area" and "scratches and bruises on her hands, like she had been in a scuffle or fight." Fry, who was "in a panic," told Moore "that Mr. Taylor grabbed her by the throat, [that he] squeezed tight, and [that] . . . she couldn't breathe at that point when he stopped her breathing from restraining her." Moore said that Fry's injuries were consistent with her statement. As a result, Moore filed a charge with the Morris County District Attorney's Office for family violence assault by occlusion against Taylor.

Both Fry and Steven Blythe, chief of police for the City of Lone Star Police Department, testified that, on June 24, 2020, Fry called the police again to report the theft of two of her pistols. According to Blythe, Fry reported that Taylor had stolen her guns. The State's indictment for family violence assault by occlusion was filed on September 17, 2020. Around October 2020, Taylor sent Fry photographs of two pistols. Fry testified that Taylor sent her "pages and pages of voicemails" and "20,000 or more text messages" that threatened and intimidated her. Fry said, "[Taylor] told me that he was going to kill me with my own gun." Because she believed him capable of carrying out the threat since he had stolen her guns, she reported it to the police in January 2021.

5

David Hazel, a deputy with the Upshur County Sheriff's Office, testified that Fry met with Deputy Hailey Goode on January 12, 2021, to file a report of retaliation. The January 12 meeting was recorded and played for the jury. On the recording, the jury heard Taylor's angry voicemails, including one in which he threatened to split Fry's head open. The jury also heard a voicemail from Taylor accusing Fry of "hanging 25 years over [his] head."

Rob Bowen, an investigator with the Upshur County Sheriff's Office, spoke with Fry, who had many obscene and threatening messages from Taylor. According to Bowen, Fry said that "she received a phone call where she was threated to be shot . . . by her own gun." Also according to Bowen, in December 2020, Taylor accused Fry of trying to have him imprisoned for forty years, which Bowen knew was within Taylor's sentencing range for the family violence assault by occlusion due to habitual-offender allegations in the State's indictment.

Bowen reviewed several of Taylor's text messages to Fry in the December 2020 to January 2021 time frame. In those messages, Taylor wrote, "I'm just glad I found out truth all about you before you got me 40 yrs behind all your lies" and "I'll fix ur sorry ass where you won't never take advantage of no one else." When Fry responded that Taylor's threats did not scare her and asked Taylor to leave her alone, Taylor responded, "Drop the charges like I did on your sorry ass."[1] Taylor added, "I guarantee I'll get all u stole see u get your ass beat . . . up," and "Your [sic] retarded thinking u can pull those charges off behind your sorry lies. It would be different if you was hurt." In Bowen's belief, Taylor's messages were threats that constituted

---

[1]Bowen testified that Fry had no criminal history.

retaliation. On a video recording of the meeting with Fry, Bowen recalled hearing Taylor say that he was going to kill Fry with her own gun.

Despite Taylor's threats, neither Fry nor the State dropped the charge of family violence assault by occlusion. On November 1, 2021, Taylor pled guilty to the offense and was placed on deferred adjudication community supervision. Soon thereafter, the State filed a motion to adjudicate Taylor's guilt on allegations that he violated the terms and conditions of his community supervision by contacting Fry by phone on November 14 and 15, 2021, and by using methamphetamine. On March 22, 2022, Taylor's community supervision was revoked, his guilt was adjudicated, and he received a three-year sentence of imprisonment for the assault against Fry.

Taylor testified in his defense. He admitted that he had choked her, asked her to drop the family violence charges, became angry when the charges were not dropped, and had violated his community supervision by calling her. Even so, he claimed that he never threatened to shoot Fry. He said that his angry voicemails, messages, and threats were related to her allegedly keeping his stimulus checks. In response to his testimony, the State played a jailhouse call in which Taylor asked his ex-mother-in-law to talk to Fry because they were "offering" him "25 to life," and "if she [did not] testify, they [had] nothing." After asking his ex-mother-in-law to persuade Fry, Taylor said he believed he would get "40 if [he was] guilty."

The jury rejected Taylor's testimony and found him guilty of retaliation.

## C.      Analysis

Fry argues that, even though the State showed "voluminous instances of [Taylor] sending vulgar and angry text messages to Fry as well [as] many unsavory voicemails," "the record lacks evidence that he said he would shoot her because she was a witness." We disagree.

The jury heard that Taylor and Fry had a history of family violence but that Fry had not reported Taylor until the June 23, 2020, choking incident. The day after, Fry reported that Taylor had taken her guns. "Section 36.06(a) not only protects witnesses but potential witnesses and those who have reported the occurrence of a crime." *Hudspeth v. State*, 31 S.W.3d 409, 412 (Tex. App.—Amarillo 2000, pet. ref'd). As in *Hudspeth*, "[u]nder the evidence presented at trial, at the time appellant made the statements at issue, [Fry] was both a potential witness and a person who had reported a crime. It is irrelevant that she had not yet testified." *Id.*

"Comments can be evaluated as threats based, not just on the language used, but also the context within which they are uttered." *Meyer v. State*, 366 S.W.3d 728, 731 (Tex. App.— Texarkana 2012, no pet.). As a result, "retaliatory intent can be inferred from [an accused's] acts, words, [or] conduct." *Umstead v. State*, 440 S.W.3d 909, 916 (Tex. App.—Eastland 2014, pet. ref'd) (mem. op.). Around the December 2020 to January 2021 timeframe, Taylor sent Fry messages that blamed her for the jail time he was facing. Text messages showed that, when Fry referenced Taylor's threats and asked him to leave her alone, Taylor responded, "Drop the charges." Fry said that, around January 12, Taylor threatened to shoot her with her own gun. Because she was concerned that he would carry out his threat, she reported the threat to the police. Although Taylor denied threatening to shoot Fry, the jury was free to reject his claim in

8

favor of Fry's testimony. *See Williamson*, 589 S.W.3d at 297. On the recording, Bowen was heard corroborating Fry's report that Taylor said he was going to shoot her. After reviewing Taylor's messages, Bowen testified that he believed Taylor was retaliating.

We acknowledge that the record contained evidence that Taylor was angry about not receiving his stimulus check. Even so, when we view all the evidence in the light most favorable to the verdict, including the progression of the text messages, Taylor's conversation with his ex-mother-in-law, and Fry's and Bowen's testimony, we conclude that a rational jury could find that Taylor's threat to shoot Fry was the result of her failure to comply with his request to try to end the family violence assault by occlusion prosecution.

We find that legally sufficient evidence showed that Taylor intentionally or knowingly threatened to harm Fry by shooting her, in retaliation for or on account of her status as a witness. Consequently, we overrule Taylor's first point of error.

## II. Taylor Failed to Preserve Any Complaint About the Admission of Extraneous-Offense Evidence

In his second point of error, Taylor complains of the trial court's admission of prior assaults he committed against Fry. Specifically, Taylor argues that the evidence was inadmissible under Article 38.371 of the Texas Code of Criminal Procedure.[2] The State argues

---

[2]Article 38.371 states,

> (a)    This article applies to a proceeding in the prosecution of a defendant for an offense, or for an attempt or conspiracy to commit an offense, for which the alleged victim is a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code.
> (b)    In the prosecution of an offense described by Subsection (a), subject to the Texas Rules of Evidence or other applicable law, each party may offer testimony or other evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the

9

that Taylor failed to preserve his complaints about the extraneous-offense evidence, and we agree.

"As a prerequisite to presenting a complaint for appellate review, the record must show that" it "was made to the trial court by a timely request, objection, or motion that . . . stated the grounds for the ruling . . . with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context" and that either the trial court "ruled on the request, objection, or motion, either expressly or implicitly" or "refused to rule on the request, objection, or motion, and the complaining party objected to the refusal." TEX. R. APP. P. 33.1(a).

Taylor complains of Moore's testimony about his assault against Fry. He also argues about the admission of "fingerprints and previous conviction, probation revocation, and judgment finding him guilty of Assault Family Violence Impeding Breath." Yet, the record shows that Taylor never objected to Moore's testimony and that he affirmatively stated that he had no objections to (1) his fingerprint card, (2) the judgment placing him on deferred adjudication community supervision, (3) documents showing his community supervision revocation, or (4) the judgment adjudicating him guilty for family violence assault by occlusion. Because Taylor failed to timely object and secure a ruling on the admission of the extraneous-

---

actor committed the offense described by Subsection (a), including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim.
    (c)    This article does not permit the presentation of character evidence that would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law.

TEX. CODE CRIM. PROC. ANN. art. 38.371 (Supp.).

offense evidence, he has failed to preserve any complaint about the admission of that evidence.[3]
As a result, we overrule his second point of error.

### III.  Taylor Was Unharmed by the Presence of the Alternate Juror in the Jury Room

In his last point of error, Taylor objects to the presence of the alternate juror in the jury room during deliberation.  Article 36.22 of the Texas Code of Criminal Procedure states, "No person shall be permitted to be with a jury while it is deliberating.  No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court."  TEX. CODE CRIM. PROC. ANN. art. 36.22.

Just before deliberation, the trial court asked if there was any objection to "letting [the alternate juror] go."  The State asked that the alternate juror be allowed to stay "just in case," and Taylor voiced no objection to the State's request.  The trial court then instructed the alternate juror in the following manner:

> THE COURT: So, Mr. [alternate juror], what your job is, is to just sit in the jury room.  You do not participate in the deliberations, you just kind of sit over to the side, and if something happened to somebody then you would step up.

---

[3]We note that Taylor argues in his brief that "the trial court had ruled it would allow extraneous offenses dealing with the nature of the relationship between Appellant and Fry."  This statement is inaccurate.  While the trial court heard argument regarding whether the extraneous-offense evidence could be admitted under Article 38.371 of the Texas Code of Criminal Procedure, the hearing ended in the following manner:

> [FOR THE DEFENSE]:  I'm aware of the . . . cases and if the proper predicate is laid, Your Honor, as a defense attorney ought to do, I'm sure I'll be objecting.

> THE COURT: Yes, sir.

> [FOR THE DEFENSE]:  I may not prevail, but . . . .

> THE COURT:  So when we get there, the Court will entertain your individual objections to that evidence.

> [FOR THE DEFENSE]:  Thank you, Judge.

11

> But once everyone gets into the jury room, you just don't participate. I know it seem like an odd thing, but that's the law in Texas. All right.

There was no objection to the trial court's admonishment. Following deliberations, the jury returned a unanimous verdict.

"To preserve an Article 36.22 claim for appellate review, a defendant must object as soon as the issue becomes apparent." *Laws v. State*, 640 S.W.3d 227, 229 (Tex. Crim. App. 2022) (citing *Becerra v. State*, 620 S.W.3d 745, 747 (Tex. Crim. App. 2021); *Trinidad v. State*, 312 S.W.3d 23, 29 (Tex. Crim. App. 2010) (holding that Article 36.22 claim was forfeited because the appellant failed to object after the trial judge said in open court that he would require the alternate juror to retire with the jury)). The reporter's record in this case shows that Taylor had ample opportunity to object to the alternate juror's presence in the jury room but failed to do so. As a result, we find that Taylor's Article 36.22 complaint is not preserved for our review.

Even so, Taylor argues that the trial court violated Article V, Section 13, of the Texas Constitution, which requires that "petit juries in the District Court shall be composed of twelve" members. TEX. CONST. art. V, § 13. As previously noted, Taylor failed to object to the alternate juror's presence. Complaints under the Texas Constitution may be forfeited by failing to object. *See Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996). While we would typically conclude that Taylor failed to preserve his Article V, Section 13, complaint, the Texas Court of Criminal Appeals has contemplated but has "not determined whether Article V, Section 13,

12

creates a right that requires an affirmative waiver under *Marin v. State*."[4]  *Becerra v. State*, 620

S.W.3d 745, 748 (Tex. Crim. App. 2021); *see Trinidad*, 312 S.W.3d at 28.

Even assuming Taylor's Article V, Section 13, complaint does not require preservation, we overrule it because nothing shows that "the alternate juror [was] allowed to vote on the ultimate verdict in the case." *Trinidad*, 312 S.W.3d at 28.  Rather, the record shows that all twelve jurors reached a unanimous decision and, absent evidence or indications to the contrary, we presume that the alternate juror followed the trial court's express instruction not to participate in deliberations. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).  "As long as only the twelve regular jurors voted on the verdicts that the appellants received, it cannot be said that they were judged by a jury of more than the constitutionally requisite number." *Trinidad*, 312 S.W.3d at 28.  "That the alternate juror[] w[as] present in the jury rooms during deliberations, and may even have participated in all but the voting, does not mean that the jury was 'composed' of more than twelve members for purposes of Article V, Section 13." *Id.*  As a result, we overrule Taylor's last point of error.

## IV.    We Modify the Judgment to Reflect the Proper Degree of Offense

Even though we have overruled Taylor's points of error, we must modify the trial court's judgment to reflect the proper degree of offense.  "This Court has the power to correct and modify the judgment of the trial court for accuracy when the necessary data and information are part of the record." *Anthony v. State*, 531 S.W.3d 739, 743 (Tex. App.—Texarkana 2016, no pet.) (citing TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993);

---

[4]*Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997)).

13

*Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd)). "The authority of an appellate court to reform incorrect judgments is not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court." *Id.* (quoting *Asberry*, 813 S.W.2d at 529–30).

The trial court's judgment lists the degree of offense as a first-degree felony, but Taylor's charge for retaliation was a third-degree felony. *See* TEX. PENAL CODE ANN. § 36.06(c). As a result of the State's punishment-enhancement allegations, Taylor's offense was punishable "for any term of not more than 99 years or less than 25 years." *See* TEX. PENAL CODE ANN. § 12.42(d). While the enhancement allegations were used to elevate Taylor's punishment range, they did not change the classification of the underlying offense. *See id.*; *Ford v. State*, 334 S.W.3d 230, 234–35 (Tex. Crim. App. 2011); *Bledsoe v. State*, 480 S.W.3d 638, 642 n.11 (Tex. App.—Texarkana 2015, pet. ref'd). As a result, the judgment's recitation that Taylor's offense was a first-degree felony is incorrect, and we modify the trial court's judgment to reflect the proper degree of offense.

**V.      Conclusion**

We modify the trial court's judgment to reflect that Taylor was convicted of a third-degree felony.  As modified, we affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:      March 1, 2023
Date Decided:        March 13, 2023

Do Not Publish